ASHLEY v. HOLMAN.

HOLMAN v. ASHLEY.

1. LUNATIC—COMMITTEE—SUPPORT.—A committee of a lunatic should be allowed $140 per annum for the support of the lunatic, where this amount had been fixed by the Court of Equity as a proper allowance, and in a subsequent action against a former committee the lunatic's services had been ascertained to be of no value, and where no change in condition is shown, notwithstanding this present committee's declaration at the time of such former action that the lunatic earned his support by his labor.

2. IBID.—IBID.—ACCOUNTS—CORPUS—SUITS.—A committee should not be allowed sums expended by him for costs and fees out of the *corpus* of the lunatic's estate in an action instituted by this committee to recover a claim which the court adjudged to be unfounded, unless he can show not only probable cause, but overweening necessity or advantage to his *cestui que trust*, which is not shown by his representation by honorable counsel, where the existing *corpus* of the lunatic's estate was ample for his support, and the committee's declarations show that he was animated by malice.

3. IBID.—IBID.—IBID.—A committee is chargeable with what he should have received for his lunatic from the administrator of a deceased committee, and cannot claim credits improperly allowed on such accounting.

4. IBID.—IBID.—IBID.—The rule laid down to govern the accounting by successive committees of a lunatic's estate, charging them with the *corpus* and interest, and crediting them with commissions and the yearly sum allowed by the court for his support.

5. IBID.—IBID.—CHARGE.—The estate of a lunatic being exhausted, his committee may demand and enforce payment of a sum necessary for the lunatic's support from the executors and legatees of a testator who imposed this charge on such a contingency.

6. IBID.—IBID.—SETTLEMENT—BAR OF STATUTE.—An action to set aside a settlement between the committee of a lunatic and the administrator of a deceased lunatic as pretensive is barred when more than five years have elapsed between the date of the settlement and the commencement of the action.

10—44

Before TOWNSEND, J., Barnwell, July, 1894.

Two actions, one by William Ashley, a lunatic, and his committee, L. A. Ashley, against W. A. Holman and W. A. Bailey, executors of William Ashley, deceased, and his legatees, commenced June 22, 1892, and the other action was by the executors of William Ashley, deceased, against L. A. Ashley, committee, and others.   The decree of Judge Izlar was as follows:

The above entitled action was, by consent, heard by me, the judge of the second circuit being disqualified on account of his relationship to some of the parties.   The action is brought to have the court ascertain what would be a reasonable compensation, allowance, or charge per annum for the decent support of the lunatic, William Ashley, the younger, and to require the same for the last three years, and for the future years of his life, to be charged and assessed against the property of the plaintiff, L. A. Ashley, and the defendants, under the will of the testator, William Ashley, the elder, and to compel payment of the same, under the direction of the court and through its order and process, and in such way and manner as the court may direct.

The complaint alleges that William Ashley, the younger, is now a man of mature years, was many years ago adjudged a lunatic by the probate court of Barnwell County, and that his father, William Ashley, the elder, was duly appointed his committee, and that the plaintiff, L. A. Ashley, was, on the 14th day of April, 1887, duly appointed by the probate court of said county the committee of said lunatic, in the place and stead of Joseph Ashley, who had been appointed as successor to William Ashley, the elder; and that said L. A. Ashley has entered upon the duties of his office, and that said lunatic is now living with him in a helpless condition, being incapable from failing health even to feed himself.   That William Ashley, the elder, departed this life in the year 1887, leaving of force his last will and testament, which was duly admitted to probate, and upon which the defendants, W. A. Holman and W. A. Bailey, have duly qualified as executors; that the tenth clause of said will is as follows: "I consider that my afflicted

son, William Ashley, is sufficiently provided for in the estate he derived from his grand-father, Josiah Stallings, and, therefore, make no provision for him in my will; but should the estate derived from his grand-father in any manner fail him, or should he from any other cause lack a proper support and maintenance, I direct my executors, by a fair and equal assessment upon the property given to my children and grand-children by this will, to raise a sum sufficient for a decent support for my son William." That the estate derived by said lunatic from his grand-father has failed him, the same having been expended and exhausted by his former committee and the plaintiff, and that he lacks a proper support and maintenance, he being now in a very helpless condition, and without any means whatever, and only cared for by the plaintiff from his private means, and that this state of affairs has existed for three years past. That $600 per annum would be a reasonable allowance for the maintenance and support of the said lunatic, considering his condition and station in life; that William Ashley, the elder, left a very large estate, both real and personal, which, under his will, he devised to his children and grand-children, the plaintiff, L. A. Ashley, and the defendants, who are in possession of the same, with full notice of the charge thereon under the tenth clause of the said will; that demand has been made upon the executors to make a fair and equal assessment upon the property given by said testator to his children and grand-children by his will, to raise a sum sufficient for the decent support of said lunatic, but that said executors have failed and declined, without just excuse, to act in the premises.

The adult defendants deny that the estate of said lunatic has failed, but, on the contrary, allege that if properly accounted for by the committee of said lunatic, will be ample for his support and maintenance; and these defendants demand that said L. A. Ashley, committee, be required to account concerning his management and disposition of the estate of said lunatic, and to apply the same to his support and maintenance. The infant defendants answer by their guardian *ad litem*, and submit their rights and interests to the protection of the court.

After the commencement of this action, W. A. Holman and W. A. Bailey, as executors of the last will and testament of William Ashley, the elder, began an action against L. A. Ashley, as committee of William Ashley, the younger, and W. Gilmore Simms, as administrator *de bonis non* of the estate of Joseph Ashley, deceased, and others, praying an account concerning the management and disposition of the estate of said William Ashley, the younger, derived from his grand-father, and other relief. To this action the defendants appeared and answered, the infant defendants answering by their duly appointed guardian *ad litem.*

These two actions were heard together on the pleadings and the evidence taken and submitted in the said actions respectively. The defendants in the last mentioned action interpose an oral demurrer to the complaint that it does not state facts sufficient to constitute a cause of action. It is contended that the executors of the will of William Ashley, the elder, cannot maintain an action against either the present committee of said lunatic or the legal representative of the former committee for an accounting touching and concerning the management and disposition of the estate of said lunatic received by them respectively. I have examined carefully the complaint of the executors, and although the allegations of fact are numerous, I confess that I fail to find in them all facts sufficient to constitute a cause of action in favor of the plaintiffs against the defendants, or any of them. The oral demurrer, in my opinion, must, therefore, be sustained, and the complaint dismissed.

The main question in the present action arises out of the tenth clause of the will of William Ashley, the elder, hereinbefore mentioned and set forth. In the construction of a will the court always endeavors to ascertain, if possible, the intention of the testator, and to carry into effect that intention. This intention, however, as was said by Chief Justice Simpson in *McGee* v. *Hall*, 26 S. C., 182, must be reached by the application of those rules of construction which have been established as best adapted to evolve said intention, and by the principles which have been applied by the courts in analogous cases. Intention reached in any other way, as by considering what

would be absolutely just to the parties, and what, in the opinion of the court, the testator ought to have done, &c., is not allowed, because such a course would often defeat the very object intended to be accomplished, to wit: the real intention of the testator. Now what did William Ashley, the elder, intend by the following language, found in the tenth clause of his will: "I consider that my afflicted son, William Ashley, is sufficiently provided for in the estate he derived from his grand-father, Josiah Stallings, and, therefore, make no provision for him in my will; but should the estate derived from his grand-father in any manner fail him, or should he from any other cause lack a proper support and maintenance, I direct my executors, by a fair and equal assessment upon the property given to my children and grand-children by this will, to raise a sum sufficient for a decent support for my son William."

It is plain that the testator knew the condition of his son, and the character and value of the estate derived by him from his grand-father. It is equally plain, also, that taking these things, the condition of his son, and the character and value of his estate, into consideration, the testator was satisfied that the estate of his son was ample for his proper support and maintenance. The language employed by the testator is: "I consider that my afflicted son, William Ashley, is sufficiently provided for in the estate he derived from his grand-father, Josiah Stallings, and, therefore, make no provision for him in this my will." But while the testator was satisfied at the time he used the foregoing language that the estate of his afflicted son, derived from his grand-father, was sufficient for his support and maintenance in his then condition, he was conscious of the fact that his condition might grow worse, and become such as to require larger expenditures from his estate; and he was also conscious of the fact that unforeseen losses might occur, even under the most prudent and careful management. It was to meet these contingencies that the testator adds: "But should the estate derived from his grand-father in any manner fail him, or should he from any other cause lack a proper support, I direct my executors, by a fair and equal assessment upon the property given to my children and grand-children by this will,

to raise a sum sufficient for a decent support for my son William." This, I apprehend, means nothing more than if at any time during the life of his afflicted son, the income derived from the "Stallings fund" should fail to meet his necessities, the deficiency should be made up by a fair and equal assessment upon the property given by the testator to his children and grand-children. This failure might arise from the condition of his son, or from a loss of a portion or the whole of the corpus of his estate; age, infirmity, and disease, even if the corpus of the estate were preserved intact, might demand larger outlays for his son than the income from the Stallings fund; or if the condition of his son continued unchanged, yet even under the most prudent and careful management, unforeseen losses might occur so as to reduce the corpus, and thus lessen the income to a degree insufficient for the proper support and maintenance of his son. These were the contingencies which the testator anticipated, and evidently intended to provide against.

The trustee should, as a prudent man, confine the maintenance of his ward within his income, and if the necessities of his ward require him to go beyond the income, he should ask and obtain the leave of the court before doing so. *Teague* v. *Dendy*, 2 McCord Ch., 207. I can never believe that the testator intended by the language used, that his children and grand-children should be required to make good the "Stallings fund" in case the same was wasted or misapplied by the committee of his son, or in case the same was partially or wholly lost by the careless or imprudent management of the committee. Again, I cannot believe that the testator intended to require his executors to make an assessment upon the property given to his children and grand-children to raise a sum sufficient for the support and maintenance of his afflicted son William, until the committee of his said son had first, by a fair, just, and proper accounting, shown that the "Stallings fund" did not yield a sufficient income for that purpose, or had been legally exhausted, and not wasted and lost by careless and imprudent management. Until this is done, it is impossible for the executors to say what sum would be sufficient for the purpose.

The bare statement of the committee is not enough. If the

trustee has committed a breach of trust, and is indebted to the estate of his ward, in consequence of a misappropriation of the trust fund, or by reason of losses arising from his careless and imprudent management of the trust estate, he should make the amount of his indebtedness good, before calling upon the executors to raise by assessment against the children and grandchildren of the testator, a sum sufficient for the proper support of his ward. If he and his sureties are unable to do so, and his ward, in consequence thereof, would be lacking in proper support and maintenance, I have no doubt but that the executors would be compelled to make the assessment required by the will of the testator, and raise a sum sufficient for the support and maintenance of his afflicted son, notwithstanding the waste and management of the estate of his son by his committee. But this must first be made clearly to appear. Such, also, would be the result, in case the accounting should show no waste nor misapplication, no breach of trust on the part of the committee, and it should be made clearly to appear, that the income derived by the committee from the trust estate of his ward, is sufficient for his proper support.

The present action is brought in the name of the lunatic, by his committee, for the purpose of compelling the executors to raise, by assessment upon the property received by the children and grand-childeren of William Ashley, the elder, under his will, a sum sufficient for the proper support and maintenance of the lunatic. The foundation of the action is, that the contingency mentioned in, and provided for by, the will of the testator, has happened. The allegation is, that the estate derived by said William Ashley, the younger, from his grandfather, Josiah Stallings, has failed him, the same having been expended and exhausted by his former committee and this plaintiff, and that he lacks a proper support and maintenance, he being now in a helpless condition, and without any means whatever. The testimony offered in support of these allegations is not at all satisfactory. No proper account has been given by the defendants (who are deeply interested) to surcharge the accounts of the committee.

Of what the estate now consists, and in what securities the

same is now invested, the defendants are without information. The defendants should be allowed this opportunity, and the committee should furnish this information. Without this, the court will have no proper data upon which to base a decree, consistent with justice and equity. I am prepared to say, however, that whatever may be the result of the accounting, which I shall hereafter order, the testimony satisfies me that a larger allowance for the support and maintenance of William Ashley than that formerly ordered by this court, is necessary. His condition has materially changed. Infirmity and disease have added to his mental affliction, helplessness has taken the place of strength, and suffering the place of health. Under these circumstances, more care, more medical attention, and more of the comforts of life, are not only proper, but absolutely necessary. But at this time I will not pass upon the question of compensation, and the other issues in the case not hereinbefore considered. It will be time enough to determine these matters when the report of the master, or the accounts of the committee of said lunatic, is submitted for consideration.

It is, therefore, ordered and adjudged, that it be referred to the master of Barnwell County, to take and state the account of L. A. Ashley, committee of William Ashley, lunatic, with his ward, from the date when he assumed said trust to the present time; that said L. A. Ashley, committee, do appear before said master on such days and at such hours as said master shall designate and appoint, and render a true, just, and fair account of all his actings and doings as such committee; and that he do show what money and other property has come into his hands as such committee, when and from whom he received the same, how and in what manner, and to whom and for what purpose, the same has been paid out, applied, and expended; and that he do also show of what the estate of said lunatic now consists, and how and in what manner the same has been and now is invested; and that he do submit for inspection and examination, all vouchers and other papers relating to said estate, and showing his receipts and disbursements.

Judge Townsend's decree was as follows:

These two cases were heard together by me at the July term of court, 1894, at Barnwell. The action first above stated, Ashley against the executors, was brought in the name of the lunatic, William Ashley, the younger, against the executors of the will of William Ashley, the elder, to require them to assess the real estate of the testator for the support and maintenance of the said lunatic, under the tenth clause of the said will, which is as follows: "I consider that my afflicted son, William Ashley, is sufficiently provided for in the estate he derived from his grand-father, Josiah Stallings, and, therefore, make no provision for him in my will; but should the estate derived from his grand-father in any way fail him, or should he from any other cause lack a proper support and maintenance, I direct my executors, by a fair and equal assessment upon the property given to my children and grand-children by this will, to raise a sum sufficient for a decent support for my son William." The defendants answer and allege that what was known as the Stallings fund has not failed the lunatic, and they call upon L. A. Ashley, as committee of said lunatic, for an accounting as to said fund.

The second of the above stated cases, the Executors *v.* Ashley, was commenced after the first one against L. A. Ashley, as committee, and W. Gilmore Simms, Esq., as administrator *de bonis non* of Joseph Ashley, deceased, for an accounting concerning the management and disposition of the said Stallings fund, and for other relief. The above defendants answer and say that the fund has been properly and legally expended, and the infant defendants submit their rights to the court for protection.

The master took the testimony and reported it to the court, and both cases were heard by Judge Izlar, who sustained a demurrer to the complaint in Executors *v.* Ashley, which, however, was finally reversed; and in Ashley *v.* Executors, he construed the said tenth clause of said will, and expressed the opinion that the allowance for the lunatic should be increased, but declined to finally decide the case, and referred it to the master to take and note the account of L. A. Ashley, as committee of said lunatic, from the time he assumed said trust to the present

time.   The master took further testimony, and has reported it to this court, and now these cases are before me.

Three important questions arise: First, has the Stallings fund been properly accounted for? Second, what additional compensation is necessary for a decent support and maintenance of said lunatic? And third, from what source is said allowance to be derived?

As to the Stallings fund, exhibit D contains a statement of the receipts and expenditures of said fund while in the hands of Joseph Ashley, and is brought down to the date of the death of Joseph Ashley, and includes a settlement between the administrator of Joseph Ashley (W. E. Ashley) and L. A. Ashley, who was appointed committee of said lunatic to succeed Joseph Ashley.   That statement is made from the returns of Joseph Ashley, with debits and credits for interest and commissions added, as directed by law, and shows the correct status of the Stallings fund, unless it contains items which it ought not to contain.   *Baker* v. *Lafitte,* 4 Rich. Eq., 347.   The executors contend that the $300 paid as attorney's fee to J. J. Maher, who was plaintiff's attorney in an action brought by Joseph Ashley, as committee, against his father's estate for the alleged benefit of the lunatic; $100 paid for Supreme Court expenses, and $142.25 paid to Molair for board of witnesses, all of which are contained in said statement, are not proper charges against the lunatic's estate (or the Stallings fund), but should have been paid by Joseph Ashley from his own funds or estate, or by his administrator; and their reason for this position is that the said action which Joseph Ashley, as committee, brought against the executors of William Ashley, the elder, was brought, to use their language, "out of malice and ill-will towards his father and his estate, and to promote his own selfish ends."

I have read all the testimony in said action, and all the proceedings therein in the different courts, and also the testimony given in the two cases now before me in relation to said action and to the declarations of Joseph Ashley, and have carefully considered the same, and all the circumstances connected therewith, and I am satified that said suit was not only not malicious, but that there was, to any reasonable mind, probable

cause therefor.   It is true, that Joseph Ashley, in the fullness of his feelings, said some things that would tend to lead to a different conclusion, but I have been impressed far less by what he said than by the facts proved in the case, and by all the other real circumstances connected with it.   *Caldwell* v. *Bennett*, 22 S. C., 2, and cases cited; *Hogg* v. *Pinckney*, 16 *Id.*, 387.   I conclude, therefore, that the items above mentioned as objected to by the executors, are proper charges against the estate of the lunatic, and the statement, to wit: exhibit D, shows the correct status of the Stallings fund up to that time; and, further, that the plaintiffs in Executors *v.* Ashley are barred as to said items by the statute of limitations.   *Suber* v. *Chandler*, 18 S. C., 532.

That statement shows a balance of $2,183.61 due by the estate of Joseph Ashley, deceased, to L. A. Ashley, committee, and I find that W. E. Ashley, as administrator of Joseph Ashley, paid this last named sum to L. A. Ashley, as committee, on the 25th April, 1887.   What I have said, except as to the statute of limitations, applies to the $724.65, paid by L. A. Ashley, as committee, from the $2,183.61 received from the estate of Joseph Ashley, deceased.   There is, also, another reason why L. A. Ashley should pay this amount, or this claim; it was the costs in the same action by Joseph Ashley against Wm. Ashley's estate, and as the court had not ordered Joseph Ashley to pay it, L. A. Ashley, as committee, was legally bound to pay it, and he acted discreetly in paying without waiting for an execution, and probably supplementary proceedings, and a still greater expense.   *Clark* v. *Wright*, 26 S. C., 196.   This item of $724.65 appears in the annual returns of L. A. Ashley, as committee.   The next most important item in said returns is $1,120, paid by L. A. Ashley, as committee, to himself for the support and maintenance of said lunatic during eight years in the lifetime of Joseph Ashley, and while Joseph Ashley was committee of said lunatic.   This is objected to mainly on the ground that said services were rendered gratuitously, and the testimony of L. A. Ashley, in said suit already mentioned, is relied on to support this position.   L. A. Ashley swears, also, in this case, and explains what he meant

by what he swore on the former occasion, and swears that he always expected to get pay for said services.  I find, too, that in his first annual return as committee he brought that item to the attention of the probate court, and that the court allowed it.  There can be no further question, then, about the legality of that payment; but, aside from the order and authority of the probate court, I am convinced that it was a proper and legal charge against the estate of the lunatic.

The balance of the Stallings fund was properly expended in the support and maintenance of the lunatic, and I find that, for three years immediately preceding the commencement of this action, L. A. Ashley supported and maintained this lunatic in a diseased and almost helpless condition without any funds, notwithstanding proper demands were made upon the executors therefor.  I conclude, therefore, that the Stallings fund has been properly accounted for; that it was exhausted some years ago, and that the present committee is entitled to compensation for supporting and maintaining the lunatic for the last three years immediately preceding the commencement of this action, at an increased rate over what was previously ordered by the probate court, and, also, from the commencement of this action until the present time.

The next question is, how much shall this allowance be?  L. A. Ashley, in his testimony, fixes it at $12 for his board, and $8 for servant hire, but fails to say what the servant's board would cost, and what would be due himself and wife for their nightly visits to his room to wash and dress him, and to render him proper services.  Dr. Hunter, who, I assume, is disinterested, testified that he thought it worth from forty to fifty dollars per month, and from all the testimony, I conclude that $40 per month, and $35 per annum for clothes, would be a reasonable allowance for those years immediately preceding the commencement of this action, to wit: 22d June, 1892, and the same in proportion from the commencement of this action to the present time, 28th August, 1894.

It is, therefore, ordered, adjudged, and decreed, that W. A. Holman and W. A. Bailey, as executors of the will of William Ashley, the elder, deceased, forthwith assess the lands men-

tioned in the tenth clause of said will, a sum sufficient to pay $1,545 for the support and maintenance of the lunatic, William Ashley, the younger, for the three years immediately preceding the 22d June, 1892 (this is to include clothing), and $1,154.31 for the support and maintenance (including clothing) of said lunatic from the 22d day of June, 1892, to the 28th August, 1894, and that they collect the same and pay it to L. A. Ashley, or his attorney, within thirty days from the filing of this decree; and if the said executors fail in any particular to do as hereinbefore directed, the master for Barnwell County is hereby ordered and directed to make said assessment immediately after the expiration of the thirty days, and, alter legal notice, sell the lands, or so much thereof as may be necessary to raise the amounts hereinbefore directed to be raised, clear of all expenses and commissions, for cash; and, after paying all expenses and commissions, pay the same to L. A. Ashley, as committee, or his attorneys. I find that no funds or other assets of the estate of Joseph Ashley have gone into the hands of W. Gilmore Simms, as administrator *de bonis non* of said estate. It is further ordered, that the complaint in the case of W. A. Holman and W. A. Bailey, as executors, *et al.* against Carrie J. Ashley *et al.*, be dismissed, and that the plaintiffs pay the costs of said action. It is further ordered, that the case of Wm. Ashley, the younger, by his committee, against W. A. Holman and W. A. Bailey, as executors, *et al.*, be retained on the calendar to facilitate future assessments, if such be found necessary. It is further ordered, that this decree be filed forthwith, and a copy thereof be served upon W. A. Holman and W. A. Bailey without delay. It is further ordered, that William Ashley, the younger, by his committee, have leave to apply at chambers for any order necessary to carry out this decree.

The defendants in the first action, the executors and legatees of William Ashley, the elder, appealed on the following grounds:

1. That his honor erred in ordering an assessment to be made by the executors of William Ashley upon the lands mentioned in the tenth clause of the will, for the support of the lunatic,

William Ashley, until the Stallings fund had been properly accounted for. Such order being inconsistent with the decree of Judge Izlar, made in said cause on the     day of September, 1893, wherein he refused to order an assessment, upon the ground that the said L. A. Ashley had not made a proper accounting of the Stallings fund, the showing before Judge Townsend being in all respects the same as that before Judge Izlar.

2. That his honor erred in finding as matter of fact that the prosecution by Joseph Ashley of the action brought by him as committee against the executors of the will of Wm. Ashley, the elder, was not malicious, and that there was probable cause therefor; whereas, his honor should have found from the testimony that the prosecution of said action was malicious, without probable cause; and should have concluded as matter of law that the costs and expenses of said action were not proper charges against the estate of the lunatic, Wm. Ashley.

3. That his honor erred in holding as matter of law. that it was the duty of L. A. Ashley, committee, to pay the costs in said action brought by Joseph Ashley, as committee, against the executors of Wm. Ashley out of the estate of his ward; and in holding the payment of said costs to be a proper disbursement on behalf of said estate.

4. That his honor erred in allowing L. A. Ashley the sum of $1,120, for the support of the lunatic for the nine years previous to his appointment as committee, for during this time he had affirmed upon oath that no charge was made; and it appeared from the great preponderance of the evidence, that said support was furnished the lunatic during those years, partly as a gratuity and partly for services performed.

5. That his honor erred in holding that the defendants herein were bound by the order of the probate court allowing the charge in his first annual return by the said L. A. Ashley, as committee, of $1,120 for the support of his ward for nine years preceding his appointment as committee; whereas, his honor should have held that these defendants, the child and grandchildren of Wm. Ashley, the elder, were quasi sureties for the support of the lunatic, and not being parties to the proceedings in the probate court, could assert their rights in this action,

and have the Stallings fund legally administered, to the end that they might be saved harmless.

6. That his honor erred in not finding and holding that L. A. Ashley committed a fraud on the rights of these defendants and on the judge of probate in asking for $1,120 for the nine years' support of the lunatic previous to his appointment as committee, when he had on oath stated that he made no such charge, and that he was estopped by his conduct and declarations during said nine years to make said charge of $1,120.

7. That his honor erred in holding that L. A. Ashley had the right as committee to exhaust the estate of his ward in the payment of said charge of $1,120 for support, &c., and of the costs in the case of Jos. Ashley, committee, *v.* Executors of William Ashley, without obtaining an order of court permitting him to do so.

8. That his honor erred in allowing the committee, L. A. Ashley, compensation for the support of the lunatic, Wm. Ashley, in excess of the sum of $140 per annum, as this amount had been fixed by the probate court at the solicitation of said committee upon a similar state of facts.

9. That his honor erred in allowing L. A. Ashley $480 for the maintenance of the lunatic during the years 1889 and 1890, as for these years he made returns in the probate court, in which he charged his ward with $140 per annum for his support.

10. That his honor erred in fixing the compensation to committee for care and support of the lunatic at forty dollars per month, or $480 per year, the same being contrary to the preponderance of evidence in the case and unreasonable.

11. That his honor erred in allowing L. A. Ashley, committee, the sum of $1,545 for the support and maintenance of the ward previous to the commencement of this action and previous to the demand upon the executors herein to make an assessment upon the children and grand-children of Wm. Ashley, the elder, and in ordering an assessment to raise said amount.

12. That his honor erred in ordering, adjudging, and decreeing the sale of lands herein.

The plaintiffs in the second above mentioned action, W. A.

Holman *et al. v.* Carrie J. Ashley *et al.*, also gave notice of appeal from said decree on the following grounds:

13. That his honor erred in finding as matter of fact that the prosecution by Joseph Ashley of the action brought by him as committee against the executors of the will of William Ashley, the elder, was not malicious, and that there was probable cause therefor; whereas, his honor should have found from the testimony that the prosecution of said action was malicious, without probable cause, and should have concluded as matter of law that the costs and expenses of said action were not proper charges against the estate of the lunatic, Wm. Ashley.

14. That his honor erred in finding and holding that exhibit D shows a correct *status* of the Stallings fund up to the appointment of L. A. Ashley as committee, in that: (a) Said statement includes charges for counsel fees and expenses incurred by Joseph Ashley, committee, in the malicious prosecution of said action of Jos. Ashley, committee, against W. A. Holman *et al.*, executors, &c. (b) Said statement includes a charge for commissions to Joseph Ashley, as committee, which were not made by the committee during his lifetime, not embraced in his annual returns as such committee, the preponderance of evidence showing that it was not the intention of the committee to charge said commissions.

15. That his honor erred in holding that the plaintiffs were barred as to contesting the validity of said statement, exhibit D, and the items therein charged, by the statute of limitations.

*Messrs. Patterson & Holman* and *Bellinger, Townsend & O' Bannon,* for plaintiff.

*Messrs. Henderson Bros.,* contra.

April 16, 1895. The opinion of the court was delivered by

MR. JUSTICE POPE. The two foregoing actions were heard together in the Circuit Court, and have been presented in this court on appeal together. The first named is an action by a lunatic by his committee, and by such committee in his representative character and as an individual against the executors of the last will of William Ashley, the elder, and all the lega-

tees and devisees under said will, and the grantees of any of
the devisees under said will, for the purpose of having the ex-
ecutors, in the first instance, or in the event they have settled
the estate of their testators, in the second instance, to have the
legatees and devisees and grantees to pay a reasonable compen-
sation, allowance or charge each year for the decent support of
said lunatic, upon the ground that the contingency contem-
plated by the testator, as announced in the tenth clause of his
will requiring such payment, had occurred. The defendants,
while admitting their liability under said tenth clause of said
will to pay a reasonable compensation for the support of the
lunatic in a certain contingency in said clause provided, denied
that such contingency had occurred.

The second named[1] is an action by the executors of the last
will of William Ashley, the elder, and in their own right, and
Mrs. V. V. Holman, against the committee of the lunatic, the
administrator *de bonis non* of the estate of Joseph Ashley, de-
ceased, and against the devisees of the lands of W. Elmore
Ashley, deceased, who was the administrator of the estate of
Joseph Ashley, deceased, heir at law of his estate, but is now
deceased, for the purpose of upsetting an alleged pretensive
settlement by and between the committee, L. A. Ashley, who
succeeded Joseph Ashley as said committee of the lunatic,
William Ashley, the younger, made in the year 1887.[2] The
defendants denied that such settlement was pretensive, collu-
sive or fraudulent, and pleaded the statute of limitations as a
bar to the action. The administrator *de bonis non* of Joseph
Ashley, deceased, pleaded no assets in his hands, and that the
estate of his intestate had been fully settled years before his
appointment as administrator *de bonis non.*

Testimony was taken in both actions before the master, and
the actions came on for trial before his honor, Judge Izlar, sit-
ting as a chancellor. By his decree in the first action he re-
committed it to the master for further testimony (his decree
will be set out in the report of the case), and he dismissed the
second action for failure to state facts sufficient to constitute a

---

[1] Commenced September 28, 1892.     [2] April.

11—44

cause of action, but on appeal to this court this judgment was reversed. *Holman* v. *Ashley*, 40 S. C., 421. Further testimony was taken in both cases. These causes were then heard by Judge Townsend sitting as chancellor, and on the 22d August, 1894, he filed his decree, wherein he sustained the plaintiff on the first action, and dismissed the second action. His decree will be reported, together with the grounds of appeal therefrom. While we do not deem it necessary to consider each ground of appeal separately, still we will dispose of all the questions suggested therein.

We may state the first proposition thus: was it competent for L. A. Ashley, as committee, to recover $140 each year for eight years, beginning in February, 1879, for the board and care of the lunatic? We find that the father and first committee received $140, under the decree of the Court of Equity, made in 1855, each year for these purposes, and the testimony fails to show any change in the condition of the lunatic in the period of time, eight years, here referred to, and the twenty-four years' reckoning from 1855, during which time William Ashley, as committee, had charge of him. Appellants suggest that this $1,120 (eight years at $140 per year) ought not to be allowed, because the present committee testified in the old case of *Ashley* v. *Holman*, 15 S. C., 97, and 25 S. C., 394, that the lunatic, by the labor he was able to render in the service of the person having him in charge, really earned his support. We think this was, to say the least of it, a very unwise statement to make, in view of the decretal order of the Court of Equity made on this very subject in the year 1855, wherein the committee of the lunatic was authorized to expend from the lunatic's estate the sum of $140 each year for his board and maintenance. It is true, the Court of Equity, in the year 1855, when it passed the decretal order referred to, did not take into consideration the ability of the lunatic to earn his own support by his labor or that the committee would receive the benefit of such services. The present committee is now brought face to face with this unwise testimony of himself, yet we are not unmindful of the facts that, at the time he made such statements, he did qualify them by stating that no ar-

rangement had been made by him with Joseph Ashley, as committee of the lunatic, as to the support of the latter, and also, that L. A. Ashley was at that time under an obligation to pay his uncle, Joseph Ashley, a large debt of $7,000, and seems to have been controlled by the stronger will of the said Joseph Ashley.

The evidence seems to establish that, when Joseph Ashley, as committee of the lunatic, brought his action against the executors of his father, William Ashley, the elder, to recover from the estate of such testator the sum of $5,400, as the value of the alleged services of the lunatic, William Ashley, the younger, rendered to the lunatic's father for twenty-seven years, at $200 per year, L. A. Ashley was guilty of a wrong when he connived at this step of his uncle, Joseph Ashley. However, we must not forget that this court decided that Joseph Ashley was not entitled to recover anything from the executors of his father's will on account of the alleged services of the lunatic for twenty-seven years; and now, if we were to hold that this sum of $140, for each year's board and maintenance of this lunatic, should not be paid to L. A. Ashley for the eight years' care of the lunatic, on the ground that the lunatic's services, voluntarily rendered to him by L. A. Ashley, were worth his board and maintenance, we would, to a certain extent at least, be impinging upon the former decision of this court. We now say that the wisdom of the judgment of this court, as set out in 25 S. C., 394, has been fully vindicated by subsequent events. This is a court of equity that now considers this contention, and it is necessary that our conclusions shall accord with the demands of good conscience. We are satisfied, after a careful examination of all the facts embodied in the case relating to the payment to L. A. Ashley for eight years' care and maintenance of the lunatic of the sum of $1,120, must be sustained.

The next proposition may be thus stated: What responsibility attaches, under the law, to a committee, or other trustee, in carrying on, as plaintiff, a litigation, whereby the estate of his *cestui que trust* may be affected, especially when the estate of such *cestui que trust* is imperilled, both *corpus* and the interest thereon, by such litigation? Now, that

it may be seen that this proposition necessarily concerns the present action, let us state the facts bearing thereon. In February, 1855, the Court of Equity for Barnwell appointed William Ashley, the elder, the committee of his son, William Ashley, the younger, who had, in October, 1854, been adjudged a lunatic, and allowed the committee the sum of $140 per annum for the care and maintenance of said lunatic; and this arrangement continued until February 22d, 1879, when such committee died. The estate of the lunatic was the sum of $2,000, derived under the will of the grand-father of said lunatic, one Josiah Stallings. On the 5th day of April, 1879, Joseph Ashley was appointed the successor of his father as said committee, and received the Stallings fund, from the executors of his father's will, on the 22d August, 1879, then amounting to $2,070. By the tenth clause of the will of William Ashley, the elder, it is provided as follows: "I consider that my afflicted son, William Ashley, is sufficiently provided for in the estate he derived from his grand-father, Josiah Stallings, and, therefore, make no provisions for him in my will; but should the estate derived from his grand-father in any manner fail him, or should he from any other cause lack a proper support and maintenance, I direct my executors, by a fair and equal assessment of the property given to my children and grand-children by this will, to raise a sum sufficient for the decent support for my son William."

Under these circumstances, namely: with a fund already in his hands, the annual interest from which had proved fully sufficient for his support and maintenance, and with the lunatic in robust physical health, coupled with the fact that, under his father's will, his whole estate, real and personal, was made liable for the support of the lunatic in case the Stallings fund failed, or in the event from any other cause said lunatic should lack a proper support, this new committee, Joseph Ashley, on the 13th April, 1880, in the Court of Equity, began the contention with his father's executors, to make them pay over $5,000 for over twenty-four years' work of the lunatic. Now no sane man can say that this suit was started to procure sustenance for the lunatic; that he already had. Nor was it that his future was precarious; for, as we have already seen, that

was absolutely secure.    What was the probable cause of this
lawsuit?    The testimony of at least four witnesses—and they
are uncontradicted except as we shall hereafter specify—shows
that it was spite aimed at his sister, Mrs. Holman, and her
children, because they were beneficiaries under the will of
William Ashley, the elder, and this Joseph Ashley was not so
favored!    As Mr. Joseph Ashley expressed it: "He did not
know [whether he would win the case or not], but as far as he
was concerned, he did not care anything about winning it, but
wanted to show Jake Holman that he could not make William
Ashley's will."    It seems that Mr. Jacob Holman had married
the daughter of William Ashley by his second marriage, while
Joseph Ashley was the son by the first marriage of his father.

We stated a while ago that this testimony is uncontradicted
by witnesses; that statement is correct, but plaintiffs have re-
ferred to the result of the case of Joseph Ashley, as committee,
against the executors, as set out in 15 S. C. and 25 S. C., *supra*,
as well as to the high character of the two attorneys who were
retained by Joseph Ashley to conduct this litigation—ex-Judge
Maher and Mr. Isaac M. Hutson.    *But it no where appears in the
"Case" that either one of these gentlemen was informed of his motive
in bringing such action.*    It is not recognized as law in this State,
that if an attorney or attorneys of character advise a litigation,
that such fact *establishes* the existence of a probable cause of
action.    All the effect the law accords to such lawyer's opinion
is that it should be considered by the jury, or the judge when
reaching a conclusion in the pursuance of such a question of
probable cause or not.    This is the rule as stated by Mr. Jus-
tice McIver, in *Caldwell* v. *Bennett*, 22 S. C., 9: "We think the
true rule is that after the jury (this was a jury case) have been
instructed as to what constitutes probable cause, as matter of
law it is for them to say, from a review of all the facts and cir-
cumstances proved to have been present to the mind of the
prosecutor at the time he commenced the prosecution, *or to the
plaintiff at the time he commenced his civil action* (italics ours)
whether there was or not probable cause for such proceedings."

The Circuit Judge reached the conclusion that there was
probable cause in the action of Joseph Ashley against the ex-

ecutors, *supra,* and then stopped.   He did not consider that
phase of the question when a trustee, by trusting to his own
judgment, commences an action, whereby he risks the estate of
his *cesqui que trust* to the extent of, not only the interest earned,
but also the *corpus* of such estate.   We have always understood
the rule to be in this State, that a trustee—guardian or com-
mittee, for instance—could not trench upon the *corpus* of the
trust estate, except under very exceptional conditions, and that
if the necessities of the case should demand it, he must first
obtain the leave of court.   *Teague* v. *Dendy,* 2 McCord Ch.,
207; *Haigood* v. *Wells,* 1 Hill Ch., 60; *Villard* v. *Robert,* 2 Strob.
Eq., 40; *Prince* v. *Logan,* 1 Speer Eq., 29.   While this is the
general doctrine that leave should be first obtained, yet such
trustee, if he can, may show that the necessity was upon him
to bring suit, and thereby justify his temerity.   It thus ap-
pears that not only must such trustee show probable cause, but
also some overweening necessity or advantage to his *cestui que
trust,* in order to justify his conduct.   A moment will show that
the rule in such cases ought to be so strict.   Otherwise it is in
the power of the trustee to expend the entire trust estate in
fees and expenses in a lawsuit wherein it was only hoped that
the trust estate might be increased.   The rule is quite different
when a trust estate is attacked by third parties.   Of course, in
such instances the principle of self-defence, of necessity, drives
the trustee to court and to the expenditure of the funds of the
*cestui que trust.*   It is not a case of *may,* but *must.*

In the case at bar, we fail to see that the propriety of a re-
sort to a suit in equity by this trustee has been established,
nor can we agree that this committee had the right thus to
jeopardize this trust estate in his hands.   We see by his returns
that he paid his attorney $400, to expenses $144.25, and for
costs $724.65, aggregating $1,266.90, out of an estate whose
*corpus* was only $2,000, thus leaving in the hands of the com-
mittee $733.10 of that *corpus,* and this last amount is to be re-
duced by commissions and other legitimate expenses of such
committee.   Can a Court of Equity be expected to sanction
such a destruction to a solemn trust?   These sums, as proper

payments, cannot be allowed, but must be made good by L. A. Ashley in his accounting hereinafter ordered.

The next question may be thus stated: upon whom will a loss be visited, for allowing illegal items to enter into a settlement made by an incoming committee with the estate of his predecessor in office? It may be asked, who represented the trust estate when the settlement was made, the administrator of the deceased committee, or was it the new committee? Certainly the new committee, and not the administrator of the deceased committee. When fiduciaries take the responsibility of making settlements out of court, they must be prepared to show, when such settlements are questioned, that the items therein embraced are legal, and should be there. If they fail to do this, they must be held to be liable for such illegal items. L. A. Ashley must account for the sums improperly entering into the settlement by him with the administrator of Joseph Ashley, deceased.

The next question is, what shall be the form of the settlement by which the amount now in the hands of L. A. Ashley, as committee of William Ashley, shall be ascertained? We lay it down thus: L. A. Ashley shall be charged with the estate received by his predecessor, Joseph Ashley, in August, 1879, viz: $2,070. Then that account must be credited with the commissions for receiving the same, together with $140 paid for one year's board and maintenance of the lunatic, together with the other legal payments made by his predecessor. The net balance must bear interest from 22d February, 1880, be credited with $140, paid for board, and also the legal payments. We mean by legal payments, all those made by Joseph Ashley, except costs and fees aforesaid. The new balance will bear interest from 22d February, 1881, be credited with $140, paid for board, and also all legal payments. The new balance must bear interest from 22d February, 1882, be credited with $140, paid for board, and also other legal payments. The new balance will bear interest from 22d February, 1883, be credited with $140 paid for board, and also other legal payments, and so on down to 1887, when L. A. Ashley is appointed committee. In his account he is entitled to commissions for receiving and

is entitled to credit for board at $140 per year until the date of his action on *22d June, 1892.* After that date such committee is allowed credits each year for $515, for the care and maintenance of the *cestui que trust,* and as soon as his ward's estate is exhausted, under the accounting herein provided, he is allowed to demand that the executors of the last will of William Ashley, deceased, shall, during each year, assess, collect, and pay over to him, as committee for the said William Ashley, the younger, the said sum of $515; and in case any one of the legatees and devisees under the will of William Ashley, the elder, shall fail to pay the amount assessed against him or her by the said executors, the said legacies and devises may be sold under the process of the court by the master for Barnwell County, to raise their respective assessments for the support of such lunatic as aforesaid.

So much of the decree as dismisses the second action is sustained, because the statute of limitations is a perfect protection to the estate of Joseph Ashley, deceased, so far as the plaintiffs to the second action are concerned. It follows, therefore, that the decree must be modified as herein required.

It is the judgment of this court, that the judgment of the Circuit Court as to the first action be modified as herein required; and the action is remanded to the Circuit Court for the formulation of a decree, after the accounts are recast as required herein by the master for Barnwell County. It is the further judgment of this court, that the judgment of the Circuit Court in the second action is affirmed.